ORIGINAL

E-filing

FILED

2012 OCT 10 P 12: 59

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  CEDRIC C. CHAO (SBN 76045)
   CChao@mofo.com
2  S. RAJ CHATTERJEE (SBN 177019)
   SChatterjee@mofo.com
3  SETH A. SCHREIBERG (SBN 267122)
   SSchreiberg@mofo.com
4  TARYN S. RAWSON (SBN 277341)
   TRawson@mofo.com
5  MORRISON & FOERSTER LLP
   425 Market Street
6  San Francisco, California 94105-2482
   Telephone: 415.268.7000
7  Facsimile: 415.268.7522

8  BARBARA J. PARKER, City Attorney (SBN 69722)
   BParker@oaklandcityattorney.org
9  DORYANNA MORENO, Chief Assistant City Attorney (SBN 140976)
   DMoreno@oaklandcityattorney.org
10 MARK MORODOMI, Supervising Deputy City Attorney (SBN 120914)
   MMorodomi@oaklandcityattorney.org
11 AMBER MACAULAY, Deputy City Attorney (SBN 253925)
   AMacaulay@oaklandcityattorney.org
12 One Frank H. Ogawa Plaza, 6th Floor
   Oakland, California 94612
13 Telephone: 510.238.3601
   Facsimile: 510.238.6500
14
   Attorneys for Plaintiff
15 CITY OF OAKLAND

16
                        UNITED STATES DISTRICT COURT
17
                      NORTHERN DISTRICT OF CALIFORNIA
18
19 CITY OF OAKLAND,                        Case No.   C 12   5245

20                 Plaintiff,              COMPLAINT FOR DECLARATORY
                                           AND INJUNCTIVE RELIEF
21        v.
                                                              MEJ
22 ERIC HOLDER, Attorney General of the
   United States; MELINDA HAAG, U.S.       DEMAND FOR JURY TRIAL
23 Attorney for the Northern District of
   California,
24
                 Defendants.
25
26
27
28

   COMPLAINT
   sf- 3201156

1

**NATURE OF THE ACTION**

2    1.    This is a civil action to restrain and declare unlawful ongoing and threatened

3    attempts by the U.S. Department of Justice (DOJ) to seize real property within the City of

4    Oakland ("Oakland") used to provide medical cannabis to patients in compliance with Oakland

5    ordinances and California law and located at 1840 Embarcadero, Oakland, California, which is

6    the business address for Harborside Health Center. That property is vital to the safe and

7    affordable distribution of medical cannabis to patients suffering from chronic and acute pain, life

8    threatening and severe illnesses, diseases, and injuries. Oakland has a broad public interest in

9    promoting the health, safety, and welfare of its citizens, in protecting the regulatory framework it

10   adopted in compliance with the laws of the State of California concerning medical cannabis, and

11   in receiving tax revenue from the well-regulated medical cannabis dispensaries located within its

12   boundaries.

13   2.    Oakland established its comprehensive regulatory framework for medical cannabis

14   dispensaries in 2004. By 2006, four dispensaries were operating transparently, providing medical

15   relief for thousands of suffering patients and paying taxes that support Oakland's municipal

16   functions. The federal government was fully aware of these events from their outset.

17   3.    After 2006 and continuing up to October 2011, the DOJ repeatedly stated that

18   patients, caregivers, and those who complied with state law would be left alone. Oakland relied

19   on those statements and the DOJ's policy of non-enforcement of conflicting federal law to

20   support the growth of a local industry that is considered a national model for safe access. Now,

21   over five years later, the federal government is attempting to act beyond its authority in seeking

22   forfeiture of property connected with one of these dispensaries in *United States v. Real Property*

23   *and Improvements Located at 1840 Embarcadero, Oakland, California*, No. 3:12-cv-03567-MEJ

24   (N.D. Cal. filed July 9, 2012) (the "*Harborside Action*"). This seizure of property violates the

25   applicable statute of limitations and principles of equitable estoppel and should be enjoined by

26   this Court.

27

28

COMPLAINT
sf- 3201156

1

**PARTIES**

4. Plaintiff City of Oakland is a municipal corporation and chartered city organized and existing under the laws of the State of California with a residential population of approximately 400,000 and an annual, all-funds budget of approximately $990 million. To service the needs of its residents, Oakland licenses medical cannabis dispensaries according to a strict permitting procedure that complies with and effectuates certain mandates of California law.

5. Defendant Eric Holder is the Attorney General of the United States, and the head of the DOJ, sued here in his official capacity. Attorney General Holder has supervisory authority over all United States Attorney's Offices and their personnel, including Defendant Melinda Haag, as well as the Drug Enforcement Administration (DEA) and its personnel. As the head of the DOJ, Attorney General Holder is responsible for the actions taken in excess of the government's authority granted by the Controlled Substances Act.

6. Defendant Melinda Haag is the United States Attorney for the Northern District of California, sued here in her official capacity. She is the chief federal law officer of the Northern District of California, and, as such, directly supervises Assistant United States Attorneys and DEA agents in this District.

**JURISDICTION AND VENUE**

7. The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702. Plaintiff seeks a declaratory judgment and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the Administrative Procedures Act, 5 U.S.C. §§ 702, 706.

8. Venue is proper in this judicial District pursuant to 28 U.S.C. §§ 1391(b) and (e) because a substantial part of the events giving rise to this action occurred in this District.

9. Plaintiff City of Oakland has no plain, speedy, or adequate remedy in the ordinary course of law because, unless this Court grants the relief requested, the actions of Defendants complained of herein will result in irreparable harm to the City of Oakland and its residents, and to the public in the manner described herein, in violation of federal law and contrary to the public

1    interest. No monetary damages or other legal remedy could adequately compensate the City of

2    Oakland, its residents, or the public for this harm.

3        10.    The City of Oakland and its residents are persons adversely affected and aggrieved

4    by a federal agency action and are entitled to judicial review of that action under section 702 of

5    the Administrative Procedures Act. 5 U.S.C. § 702. As more fully alleged herein, the interests of

6    Plaintiff and its residents are being directly and significantly harmed by Defendants' illegal

7    action. The relief requested will fully redress those injuries.

8                              **FACTUAL BACKGROUND**

9        11.    The City of Oakland has established a comprehensive framework regulating the

10    sale of medical cannabis that effectuates the mandates of state law and ensures safe and

11    affordable access to medical cannabis for patients suffering from chronic and acute pain, as well

12    as life-threatening and severe illnesses, diseases, and injuries.

13             **Medical Cannabis Regulation in California Through 2001**

14       12.    In 1996, California voters adopted Proposition 215, the "Compassionate Use Act,"

15    Cal. Health & Safety Code § 11362.5. The Compassionate Use Act is intended to "ensure that

16    seriously ill Californians have the right to obtain and use marijuana for medical purposes where

17    that medical use is deemed appropriate and has been recommended by a physician who has

18    determined that the person's health would benefit from the use of marijuana . . ."; "ensure that

19    patients and their primary caregivers who obtain and use marijuana for medical purposes upon the

20    recommendation of a physician are not subject to criminal prosecution or sanction"; and

21    "encourage the federal and state governments to implement a plan to provide for the safe and

22    affordable distribution of marijuana to all patients in medical need of marijuana." Cal. Health &

23    Safety Code § 11362.5(b)(1)(A)-(C).

24       13.    In 1998, Oakland adopted regulations to implement the Compassionate Use Act

25    and to establish its medical cannabis distribution program. Oakland, Cal., Code of Ordinances,

26    ch. 8.46. Oakland authorized up to one "medical cannabis provider association" to "distribute

27    safe and affordable medical cannabis in a consistent, reliable, and legal fashion." The provider

28    association was required to consist solely of "qualified patients or primary caregivers." *Id.*

COMPLAINT
sf- 3201156

3

1    14.    "In order to ensure that qualified patients and primary caregivers are not subject to

2    criminal prosecution or sanction, and to ensure that only qualified patients and primary caregivers

3    have access to medical cannabis, the city of Oakland, or medical cannabis provider associations

4    on behalf of the city of Oakland, may issue valid identification cards to qualified patients and

5    primary caregivers upon receipt of a physician's recommendation or approval for medical

6    cannabis." *Id.*

7    15.    In August 1998, Oakland designated Oakland Cannabis Buyers Cooperative

8    ("OCBC"), a non-profit organization operating in downtown Oakland, as Oakland's sole

9    authorized provider association.

10    16.    Legal action by the federal government forced OCBC to close in 2001.

11    **The Current Regulation of Medical Cannabis**

12    17.    In 2003, the California Legislature added the "Medical Marijuana Program Act,"

13    article 2.5 ("MMPA"), to the Health and Safety Code in order to "promote uniform and consistent

14    application of the [Compassionate Use Act] among the counties within the state" and "enhance

15    the access of patients and caregivers to medical marijuana through collective, cooperative

16    cultivation projects." Cal. Stats. 2003, ch. 875 § 1(b) (Sen. Bill No. 420).

17    18.    The statute includes guidelines for the implementation of the Compassionate Use

18    Act, including a voluntary identification card program.  While a patient "need not possess an

19    identification card in order to claim the protections" offered by the MMPA, cardholders are

20    afforded limited immunity from prosecution for violation of various sections of the Health and

21    Safety Code regulating marijuana. Cal. Health & Safety Code §§ 11362.715, 11362.765,

22    11362.775.

23    19.    The MMPA thus *exempts* dispensaries from prosecution under Health and Safety

24    Code section 11570, which provides: "Every building or place used for the purpose of unlawfully

25    selling, serving, storing, keeping, manufacturing, or giving away any controlled substance . . . is

26    a nuisance which shall be enjoined, abated, and prevented, and for which damages may be

27    recovered, whether it is a public or private nuisance." The MMPA also provides: "Nothing in this

28

COMPLAINT                                                                                                    4
sf- 3201156

1  article shall prevent a city or other local governing body from adopting and enforcing . . . laws

2  consistent with this article." Cal. Health & Safety Code § 11362.83.

3      20.    Following enactment of the MMPA, the City of Oakland designed a regulatory

4  scheme for medical cannabis dispensaries in order to maintain public health and safety.

5      21.    In February 2004, the Oakland City Council authorized Oakland's medical

6  cannabis dispensary permitting process, allowing up to four dispensaries. Oakland, Cal., Code of

7  Ordinances, ch. 5.80 *et seq.* In November 2004, Oakland residents passed Measure Z, which

8  required Oakland to tax and regulate the use of medical cannabis.

9      22.    Following enactment of the ordinance, Oakland engaged in a competitive

10  application process that resulted in the granting of four permits. Thereafter, Oakland devoted

11  substantial public safety resources to closing unlicensed dispensaries.

12      23.    Pursuant to this ordinance, Oakland actively monitors licensed dispensaries,

13  including annual auditing of their financial statements and employee backgrounds to ensure

14  compliance with city and state law.

15      24.    Harborside Health Center received a permit in 2006. In addition to Harborside,

16  three other dispensaries are licensed, including Coffeeshop Blue Sky, Purple Heart Patient Center,

17  and Oakland Organics.

18                          **Benefits of Regulated Medical Cannabis**

19      25.    The benefits of medical cannabis to patients suffering from chronic pain associated

20  with debilitating illnesses such as cancer, AIDS, and multiple sclerosis are well documented. In

21  1999, an Institute of Medicine study funded by the Office of National Drug Control Policy

22  concluded that scientific studies supported medical cannabis to treat patients such as those with

23  AIDS or those who are undergoing chemotherapy and who suffer simultaneously from severe

24  pain. SJ Watson et al., *Marijuana Medicine: Assessing the Science Base: A Summary of the 1999*

25  *Institute of Medicine Report*, 57 Arch Gen. Psychiatry 547 (2000).

26      26.    The American College of Physicians, noting that marijuana has been used "for its

27  medicinal properties for centuries," has lamented that federal laws have "hindered" research into

28  further therapeutic benefits and "urge[d] review of marijuana's status as a Schedule I controlled

COMPLAINT                                                                5
sf- 3201156

1  substance and its reclassification into a more appropriate schedule." Tia Taylor, American
2  College of Physicians, *Supporting Research into the Therapeutic Role of Marijuana* (2008), at 2,
3  http://www.acponline.org/advocacy/where_we_stand/other_issues/medmarijuana.pdf.

4      27.    A May 2012 study in the Open Neurology Journal similarly concluded that
5  "[b]ased on evidence currently available the Schedule I classification is not tenable; it is not
6  accurate that cannabis has no medical value, or that information on safety is lacking." Igor Grant
7  et al., *Medical Marijuana: Clearing Away the Smoke*, 6 Open Neurology J. 18, 24 (Mar. 2, 2012).
8  According to those researchers, patients benefit from alternative delivery systems besides
9  smoking, including vaporization and ingestion.

10      28.    Permitting and regulating medical cannabis dispensaries has allowed Oakland to
11  monitor the dispensaries, ensure they sell medical marijuana only to those patients with valid
12  patient identification cards or with a doctor's recommendation, restrict excessive profits, and
13  prevent the diversion of cannabis for non-medical use. The dispensaries also provide varied
14  delivery systems, including topical gels, vapors, and edible forms that allow for maximum
15  efficacy.

16      29.    Importantly, regulating the dispensaries ensures the quality and safety of the
17  medical cannabis. Unregulated marijuana growers might use fertilizer, insecticide, and other
18  harmful substances and contaminants that can cause significant adverse health impacts when
19  ingested by the patient. Oakland's Administrative Regulations and Performance Standards for
20  Oakland Medical Cannabis Dispensaries ("performance standards") require testing of the medical
21  cannabis in designated independent laboratories.

22      30.    Oakland's performance standards also require that all edible medical marijuana
23  products are manufactured in compliance with State Department of Health regulations, and that
24  all dispensary employees undergo a background check by a reputable third party.

25      31.    The dispensaries have provided revenue to Oakland's general fund and contributed
26  to the rejuvenation of Oakland's downtown core. Harborside Health Center, Oakland's largest
27  dispensary, and currently the subject of the *Harborside Action*, has paid city and state taxes in
28  excess of one million dollars, along with an initial permit fee. Harborside Health Center's

COMPLAINT 6
sf- 3201156

1 customers pay an 8.75% sales tax on all purchases. Harborside employs dozens of individuals, all
2 of whom receive a salary and full health benefits, and for whom Harborside has paid all payroll
3 taxes.

**Oakland Will Suffer Irreparable Harm if the Dispensaries Are Shuttered**

5     32.     If Defendants are allowed to proceed with their forfeiture action against
6 Harborside Health Center, and if Oakland's medical cannabis dispensaries are shut down, medical
7 patients served by the dispensaries will resort to the black market, creating a public safety hazard
8 for themselves, Oakland, and its residents.

9     33.     Instead of obtaining medicine from a city-regulated dispensary located in a
10 commercial area with ample lighting and security, medical patients, including the elderly and
11 disabled, will have no option but to seek medical cannabis from street level drug dealers. This
12 will increase crime and divert scarce Oakland Police Department resources from addressing the
13 violent crime, illegal guns, and other public safety crises that are causing the loss of many lives in
14 Oakland.

15     34.     Oakland will lose its ability to monitor the quality and production methods of
16 medical cannabis sold in the dispensaries. This will create health risks for medical patients, who
17 will not know whether their medicine is tainted or produced with harmful chemical additives or
18 pesticides.

19     35.     Well-regulated dispensaries provide affordable medical cannabis in a controlled
20 setting, which decreases the market for illegal marijuana. Closing dispensaries will not reduce
21 the demand for medical cannabis, but will instead create a distribution vacuum that likely will
22 precipitate price increases, crime, and street violence.

23     **The DOJ Has Been Aware of Licensed Medical Marijuana Dispensaries**

24     36.     Federal authorities have been aware of Oakland's regulations and of the ongoing
25 operations of Coffeeshop Blue Sky, Purple Heart Patient Center, Oakland Organics, and
26 Harborside Health Center since their inception.

27     37.     Coffeeshop Blue Sky opened in 2005 as SR71 Coffeeshop. It operated as
28 Coffeeshop Blue Sky from 2006 through April 2012. Yelp reviews describing Blue Sky's

1   medical cannabis business date back to August 16, 2006.  Purple Heart Patient Center has been

2   open since September 2006.  Oakland Patient Center opened in 2006, but was transferred to new

3   ownership in 2009, who changed the name to Oakland Organics.  The largest dispensary in

4   Oakland, Harborside Health Center, opened in October 2006.  Since that time, its website has

5   openly listed its inventory and notified the public of its business address and contact information.

6        38.      All four dispensaries operate transparently in the public domain.  For example,

7   they have public websites, Facebook pages, and Yelp reviews.

8        39.      In April 2007, Harborside and its CEO Stephen DeAngelo were profiled in the San

9   Francisco Chronicle Magazine.  *See* Katherine Seligman, *Connoisseurs of Cannabis: Like Fine*

10  *Wine, Growing Medicinal Weed Has Become So Specialized as to Inspire Tastings and a New*

11  *Vocabulary*, S.F. Chronicle (Apr. 22, 2007).

12       40.      In 2006, DEA agents took enforcement action against two nearby dispensaries,

13  New Remedies Cooperative in downtown Oakland and the Local Patients Cooperative in

14  Hayward.  New Remedies Cooperative had neither applied nor received a permit from Oakland.

15       41.      In contrast, between 2006 and April 2012, federal authorities refrained from acting

16  against duly licensed dispensaries in Oakland.

17           **The Federal Government Affirmatively Represented that It Would Not Pursue**
             **Dispensaries that Complied with State Law**
18

19       42.      The federal government observed a policy of non-enforcement of the Controlled

20  Substances Act against medicinal cannabis dispensaries that complied with state law.

21       43.      In August 2007, during his first campaign for president, then-candidate Barack

22  Obama told voters in New Hampshire, "I would not have the Justice Department prosecuting and

23  raiding medical marijuana users.  It's not a good use of our resources."  In March 2008, Mr.

24  Obama told an Oregon newspaper, "I think the basic concept of using medical marijuana for the

25  same purposes and with the same controls as other drugs prescribed by doctors, I think that's

26  entirely appropriate. … *I'm not going to be using Justice Department resources to try and*

27  *circumvent state laws on this issue."*  Gary Nelson, *He Favors Long-Term Timber-Payments*

28  *Solution*, Medford Mail Tribune (Mar. 23, 2008) (emphasis added).  In May 2008, an Obama

1    campaign spokesperson told the San Francisco Chronicle that "Obama supports the rights of

2    states and local governments" to provide their residents with medical marijuana to relieve

3    suffering from chronic disease, and that *"Obama would end U.S. Drug Enforcement*

4    *Administration raids on medical marijuana suppliers in states with their own laws."* Bob

5    Egelko, *Next President Might Be Gentler on Pot Clubs*, S.F. Chronicle (May 12, 2008) (emphasis

6    added).

7        44.    Once President Obama was elected, this policy of non-enforcement became the

8    official stance of the DOJ. In February 2009, White House spokesman Nick Shapiro told the

9    *Washington Times*, *"The president believes that federal resources should not be used to*

10    *circumvent state laws*, and as he continues to appoint senior leadership to fill out the ranks of the

11    federal government, he expects them to review their policies with that in mind." *DEA Pot Raids*

12    *Go On; Obama Opposes*, Wash. Times (Feb. 4, 2009) (emphasis added).

13        45.    Attorney General Eric Holder emphasized this policy in a press conference later in

14    February 2009. When asked whether federal action in California represented official policy, he

15    replied: "No. What the president said during the campaign, you'll be surprised to know, will be

16    consistent with what we'll be doing here in law enforcement. He was my boss during the

17    campaign. He is formally and technically and by law my boss now. *And so what he said during*

18    *the campaign is now American policy."* Nomoredrugwar, *US Attorney General Eric Holder:*

19    *Ending Medical Marijuana Raids Now US Policy*, YouTube (Feb. 26, 2009),

20    http://www.youtube.com/watch?v=kjZeW2fcQHM (emphasis added).

21        46.    In March 2009, Attorney General Holder repeated his delineation of official

22    policy, emphasizing that *"The policy is to go after those people who violate both federal and*

23    *state law."* Devlin Barrett, *Attorney General Signals Marijuana Policy Shift*, Associated Press,

24    Mar. 18, 2009 (emphasis added). The next morning, *The New York Times* reported "Obama

25    Administration to Stop Raids on Medical Marijuana Dispensers." David Johnston & Neil A.

26    Lewis, *Obama Administration to Stop Raids on Medical Marijuana Dispensers*, N.Y. Times,

27    Mar. 18, 2009, at A20.

28

1    47.    On October 19, 2009, Deputy Attorney General David W. Ogden distributed a

2  memorandum (the "Ogden Memo") that was made public via an official press release of the same

3  date. *See* Memorandum for Selected United States Attorneys, from Deputy Attorney General

4  David W. Ogden, Office of the Deputy Attorney General, *Re: Investigations and Prosecutions in*

5  *States Authorizing the Medical Use of Marijuana* (Oct. 19, 2009). The purpose of the

6  memorandum was to provide "clarification and guidance to federal prosecutors in States that have

7  enacted laws authorizing the medical use of marijuana" and "uniform guidance to focus federal

8  investigations and prosecutions in these States on core federal enforcement priorities." *Id.* While

9  the Justice Department would continue to pursue and prosecute "drug traffickers" such as

10  supporters of "the Mexican cartels," United States Attorneys were told they *"should not focus*

11  *federal resources in your States on individuals whose actions are in clear and unambiguous*

12  *compliance with existing state laws providing for the medical use of marijuana."* *Id.* (emphasis

13  added).

14    48.    The Ogden Memo sets forth certain factors that "may indicate illegal drug

15  trafficking activity" including "unlawful possession or unlawful use of firearms; violence; sales to

16  minors"; money laundering; "amounts of marijuana inconsistent with purported compliance with

17  state or local law; illegal possession or sale of other controlled substances; or ties to other

18  criminal enterprises." *Id.*

19    49.    In the accompanying press release, Attorney General Eric Holder announced: *"It*

20  *will not be a priority to use federal resources to prosecute patients with serious illnesses or their*

21  *caregivers who are complying with state laws on medical marijuana."* Press Release,

22  Department of Justice, Office of Public Affairs, Attorney General Announces Formal Medical

23  Marijuana Guidelines (Oct. 19, 2009), http://www.justice.gov/opa/pr/2009/October/09-ag-

24  1119.html (emphasis added). He stated that the DOJ would prosecute "drug traffickers who hide

25  behind claims of compliance with state law to mask activities that are clearly illegal." In

26  evaluating whether to prosecute individuals, Attorney General Holder sought to "formalize[] a

27  sensible approach . . . [to] effectively focus our resources on serious drug traffickers while taking

28  into account state and local laws." *Id.* Attorney General Holder echoed the factors cited in the

COMPLAINT
sf-3201156

10

1   Ogden Memo that were considered indicative of illegal drug trafficking, including "unlawful use
2   of firearms, violence, sales to minors, money laundering, amounts of marijuana inconsistent with
3   purported compliance with state or local law, marketing or excessive financial gains similarly
4   inconsistent with state or local law, illegal possession or sale of other controlled substances, and
5   ties to criminal enterprises." *Id.*

6         50.    In May 2010, Attorney General Holder appeared before the House Judiciary
7   Committee. When asked about federal enforcement policy regarding marijuana and the Ogden
8   Memo, Attorney General Holder testified: ***"We look at the state laws, and what the restrictions***
9   ***are . . . . Is marijuana being sold consistent with state law?"*** Hearing on the United States
10  Department of Justice Before the H. Comm. on the Judiciary, 111th Cong. 75-76 (May 13, 2010)
11  (emphasis added). He noted the "variety of factors" in the Ogden Memo, including whether
12  "firearms [are] somehow associated with the sale[.]" *Id.* When pressed regarding whether
13  statements by a DEA agent in Colorado that were contrary to the Ogden Memo could be taken as
14  "threatening" to dispensaries operating legally under state law, Attorney General Holder
15  reiterated the official policy set forth in the Ogden Memo. He acknowledged that it was
16  "incumbent upon me as Attorney General to make sure that what we have set out as policy is
17  being followed by all of the components within the Department of Justice" including the DEA
18  and the Assistant United States' Attorneys. *Id.* "[I]t is my responsibility to make sure that the
19  policy is clear, that the policy is disseminated, and that people act in conformity with policies that
20  we have determined." *Id.*

21        51.    In June 2012, Attorney General Holder testified to the House Judiciary Committee
22  that ***"we limit our enforcement efforts to those individuals, organizations that are acting out of***
23  ***conformity . . . with state laws***, or . . . where distribution centers were placed within close
24  proximity to schools." Hearing on Oversight of the United States Department of Justice Before
25  the H. Comm. on the Judiciary, 112th Cong. 21 (June 7, 2012) (emphasis added).

26  **Oakland Reasonably Relied on the Federal Government's Representations and Conduct**

27        52.    The federal government's stated position that it would not prosecute medical
28  marijuana dispensaries that were operating within state law, and conduct consistent with that

COMPLAINT                                                     11
sf- 3201156

position, led Oakland to further legitimize the medical cannabis industry by taxing its revenue and allocating this increased revenue to the general fund.

53.     In June 2009, a voter approved ballot measure, Measure F, increased the business tax rate on medical cannabis dispensaries to 1.8% of gross sales. By the end of 2009, Oakland's four permitted dispensaries generated $28 million in gross sales. In November 2010, a second voter initiative, Measure V, increased the business tax rate to 5% of gross sales. Thus, the business tax revenue increased from $7,450 in 2006 to $434,193 in 2010 once the new tax rate went into effect.

54.     Oakland currently projects over $1.4 million in business tax revenue from the four permitted operating dispensaries for 2012. This revenue is sufficient to pay for a dozen additional police officers or firefighters, or even more librarians, park directors, or other essential municipal services.

55.     In further reliance on Defendants' conduct, the Oakland City Administrator's Office dedicated resources to administering the medical cannabis regulatory program. The Deputy City Administrator devotes approximately 30% of his time to facilitating the regulation of medical cannabis dispensaries.

56.     Although in 2010 the federal government condemned a proposal to license marijuana cultivation facilities in Oakland, the DOJ did not take any action against the licensed dispensaries.

57.     Nevertheless, to ensure compliance with the terms of the Ogden Memo, Oakland reviewed and made adjustments to its ordinance to ensure that Oakland's regulations and the licensed dispensaries complied with state law.

58.     In December 2010, the Oakland City Council amended Oakland's permitting process to allow a total of eight dispensaries.

59.     Oakland then hired a new auditor for the dispensary permit fees. Oakland also sent five employees to a class at a local educational institution to learn about the medical cannabis industry generally, and the regulation and monitoring of medical cannabis. Oakland city employees spent nearly 200 hours in the aggregate learning about regulating the industry.

1   60.   In March 2012, Oakland issued four additional dispensary permits. Those
2   dispensaries are now unable to find commercial space to lease because of the federal
3   government's threats to seize real property associated with the distribution of medical cannabis.

**FIRST CLAIM FOR RELIEF**

**Forfeiture of 1840 Embarcadero Is Barred by the Applicable Statute of Limitations**
**(Declaratory and Injunctive Relief as to All Defendants)**

7   61.   The City of Oakland hereby incorporates by reference paragraphs 1 through 60
8   above as if fully set forth herein.

9   62.   Defendants assert a right to seek civil forfeiture of certain real property located at
10  1840 Embarcadero, Oakland, California based on purported violations of the Controlled
11  Substances Act. The DOJ has already filed the *Harborside Action*.

12  63.   The statute of limitations applicable to civil forfeiture proceedings pursuant to 21
13  U.S.C. § 881(a)(7) is five years. 19 U.S.C. § 1621. Defendants exceed their authority by filing
14  civil forfeiture actions more than five years after they knew or should have known that the
15  dispensaries were operational.

16  64.   Harborside Health Center has been dispensing medical cannabis at 1840
17  Embarcadero, Oakland since 2006. Defendants knew or should have known that Harborside
18  Health Center had been dispensing medical cannabis for more than five years before Defendants
19  filed suit on July 9, 2012.

20  65.   Defendants' failure to comply with the applicable statute of limitations is an abuse
21  of discretion, contrary to law, and in excess of Defendants' authority.

22  66.   There exists an actual and justiciable controversy between Oakland and the
23  Defendants regarding Defendants' authority to seek civil forfeiture of real property located at
24  1840 Embarcadero, Oakland.

25  67.   Resolution of this controversy will make a substantial difference in how Oakland
26  provides for the health, welfare, and safety of its citizens, regulates the medical cannabis industry,
27  deploys its resources to address the public safety crisis of violent crime, generates revenue, and
28  projects its budget.

COMPLAINT                                                          13
sf- 3201156

1      68.    Allowing Defendants to pursue their forfeiture action in contravention of the

2 applicable statute of limitations will cause irreparable harm to Oakland.

3      69.    Therefore, Oakland seeks a declaratory judgment that Defendants have no

4 authority to seek civil forfeiture of the real property located at 1840 Embarcadero, Oakland,

5 which is used to provide safe and affordable access to medical cannabis and has been licensed by

6 Oakland for more than five years.

7      70.    Oakland also seeks a preliminary and permanent injunction enjoining Defendants

8 from seeking civil forfeiture of the real property located at 1840 Embarcadero, Oakland.

9                                 **SECOND CLAIM FOR RELIEF**

10              **Defendants Are Estopped from Seeking Forfeiture of 1840 Embarcadero**

11              **(Declaratory and Injunctive Relief as to All Defendants)**

12      71.    The City of Oakland hereby incorporates by reference paragraphs 1 through 70

13 above as if fully set forth herein.

14      72.    Defendants abuse their discretion, act contrary to law, and exceed their authority in

15 bringing a civil forfeiture action against the real property located at 1840 Embarcadero, Oakland,

16 California, whose tenants provide medical cannabis in accordance with state law. Defendants are

17 estopped from seeking such forfeiture.

18      73.    Defendants knew at all relevant times that Harborside Health Center dispensed

19 medical cannabis at 1840 Embarcadero, Oakland.

20      74.    Although aware of the Controlled Substances Act, Defendants elected not to

21 restrict safe access to medical cannabis at licensed dispensaries in Oakland that complied with

22 state law, including Harborside Health Center, made statements to that effect, and acted in

23 conformity with those statements.

24      75.    Oakland detrimentally relied on Defendants' representations and conduct. Indeed,

25 forfeiture will endanger the public health, welfare, and safety of Oakland residents, undermine the

26 city's regulatory authority, exacerbate street crime and violence, and reduce Oakland's tax

27 revenues.

28

COMPLAINT                                          14
sf- 3201156

1    76.    Defendants' actions threaten to work a serious injustice on the residents of

2    Oakland, who overwhelmingly support regulation of medical cannabis in their city and have

3    voted repeatedly to facilitate the infrastructure required to ensure safe access. This injustice

4    outweighs any alleged public interest in seeking forfeiture of 1840 Embarcadero, Oakland.

5    77.    There exists an actual and justiciable controversy between Oakland and

6    Defendants regarding Defendants' authority to bring a civil forfeiture action against 1840

7    Embarcadero, Oakland.

8    78.    Resolution of this controversy will make a substantial difference in how Oakland

9    provides for the health, welfare, and safety of its citizens, regulates the medical cannabis industry,

10   deploys resources to address the public safety crisis of violent crime, generates revenue, and

11   projects its budget.

12   79.    Therefore, Oakland seeks a declaratory judgment that Defendants have no

13   authority to seek civil forfeiture of the real property located at 1840 Embarcadero, Oakland,

14   which is used to provide safe and affordable access to medical cannabis in accordance with city

15   ordinances and state law.

16   80.    Oakland also seeks a preliminary and permanent injunction enjoining Defendants

17   from seeking civil forfeiture of real property located at 1840 Embarcadero, Oakland, California.

18   Otherwise, for the reasons discussed above, Oakland will suffer irreparable harm.

19                                    **PRAYER FOR RELIEF**

20          WHEREFORE, Plaintiff City of Oakland respectfully requests that the Court:

21          A.    Issue a declaratory judgment that Defendants and any agency under their authority

22   have no right to seek civil forfeiture of the real property located at 1840 Embarcadero, Oakland,

23   California based on purported violations of the Controlled Substances Act.

24          B.    Issue a preliminary injunction and a permanent injunction enjoining Defendants,

25   their agents, successors, employees, attorneys, and all persons acting in concert or cooperation

26   with them or at their direction or under their control, from seeking forfeiture of the real property

27   located at 1840 Embarcadero, Oakland, California, which is used to provide medical cannabis in

28   compliance with city ordinances and California law.

COMPLAINT                                                                                    15
sf- 3201156

1    C.    Award Plaintiff its costs, including reasonable attorneys' fees.

2    D.    Grant such other relief as the Court considers proper.

3

4    Dated: October _10_, 2012                    MORRISON & FOERSTER LLP

5

6                                         By: _____
                                                Cedric C. Chao
7                                               Attorneys for Plaintiff
                                                CITY OF OAKLAND
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## DEMAND FOR JURY TRIAL

2      Pursuant to Federal Rule of Civil Procedure 38(b) and Local Rule 3-6 of the United States

3  District Court for the Northern District of California, the City of Oakland demands a trial by jury

4  of all issues so triable in this action.

5  Dated: October 10, 2012          MORRISON & FOERSTER LLP

6

7                                   By: _____

8                                          Cedric C. Chao

                                        Attorneys for Plaintiff
9                                       CITY OF OAKLAND

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28